[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried before the Regional Family Trial Docket, on a referral from the Litchfield Judicial District, on January 21st-24th, 2003. The Plaintiff and Defendant testified and numerous exhibits were introduced. The court has considered all of the credible evidence presented to it and carefully considered the respective criteria for orders of child support, health insurance, payment of children's medical expenses, alimony, property settlement, division of debt and award of counsel fees. The court makes the following findings of facts and orders:
The parties were married on June 14, 1987 in South Salem, New York. The court finds that it has jurisdiction over the marriage. One of the parties has lived in the State of Connecticut for more than one year prior to bringing this action. The following minor children have been born to the parties since the date of the marriage:
Jason Ross, date of birth April 13, 1992
Jeremy Ross date of birth December 16, 1993
No other minor children have been born to the Wife since the date of the marriage. The parties are not receiving state assistance. The court finds that the marriage between the parties has broken down irretrievably and there is no reasonable prospect of reconciliation.
The Wife is 45 years old and in good health. Mrs. Ross received her B.A. from Harvard in 1979 and did not attend graduate school or obtain an advanced degree. The Wife was unemployed at the time of the marriage and for approximately 18 months thereafter. On January 19, 1989, she opened her own business, Powerhouse Advertising in Litchfield, CT. Plaintiff's Exhibit 15 indicates she earned the following income during the early part of the marriage: CT Page 1830
1987: $39,918.00
1988: $3,579.00
1989: $11,372.00
1990: $51,300.00
1991: $38,706.00
Plaintiff's Exhibit 1 contains copies of the couple's Federal Income Tax Returns from 1991 to 2001. Mrs. Ross earned the following income:
1992: $28,000 (Plaintiff's Exhibit 1(a))
1993: $63,000 (Plaintiff's Exhibit 1(b))
1994: $55,000 (Plaintiff's Exhibit 1(c))
 1995: $129,000 (Plaintiff's Exhibit 1(d)); with a $25,000 deposit into a retirement account
 1996: $138,000 (Plaintiff's Exhibit 1(e)); with a $26,000 deposit into a retirement account
 1997: $85,000 (Plaintiff's Exhibit 1(D); with a $16,000 deposit into a retirement account
 1998: $49,805 + $3,300 from Dr. Ross to design a logo, stationary, business cards and a yellow page advertisement for his dental practice. (Plaintiff's Exhibit 1(g))
1999: $92,089 (Plaintiff's Exhibit 1(j))
 2000: $237,546 (Plaintiff's Exhibit 1(i) with a $30,000 deposit into a retirement account
2001: $341,123 (Plaintiff's Exhibit 1(j))
 2002: Gross receipts of $240,000, with an $11,500 deposit into a retirement account (testimony of Wife)
The Wife testified that she inherited $150,000 from the estate of her mother in 1990 and, through gifts and inheritance, received $130,000 from her father's estate during the period 1990-1997. Mrs. Ross testified that CT Page 1831 in 1990 she contributed $45,000 towards the purchase of the family home; wrote a check in 1992 for $10,000 to refinance the family home; paid $40,000 for the lot next to the family home; paid another $40,000 to refinance the family home; and purchased the couple's Wilton condominium in 1996 for $62,000.00. She initially testified that contributions were made to accounts in the children's name from her inheritance but backed off from that claim when it was pointed out that the inherited money would not have stretched that far. The court finds that the Wife's testimony that she inherited $280,000 during the marriage is credible and she shall receive a credit for her inheritance.
Mrs. Ross' legal and professional fees up to the time of trial were in the approximate amount of $185,000 and had been paid in full. The fees included legal fees for herself and her share of the Attorney for the Minor Children's and Guardian Ad Litem's fees, a private investigator, and appraisers.
The Wife's Financial Affidavit failed to report approximately $10,000 of interest and dividend income. Prior Financial Affidavits contained a notation that the Wife's assets were being rapidly depleted as an explanation for the absence of interest and dividend income. The court notes that an examination of her Financial Affidavits over the past year shows an increase in assets despite the claim that the assets were being depleted.
During the course of this litigation, one of the Wife's insurance policies lapsed due to the Wife's failure to pay the premium. She replaced the policy with a new policy naming the minor children as beneficiaries while the old policy named the Husband as the beneficiary.
The Wife had the family home appraised on more than one occasion. The first appraisal dated April 15th, 2002, valued the home at $490,000. (Defendant's Exhibit G.) An updated appraisal for trial dated January 18, 2003 (Defendant's Exhibit G(1)), placed a value of $460,000. Having reviewed the appraisals, the court finds the value of the marital home to be $490,000.
Dr. Ross is 48 years old and in good health. He attended Northwestern University for his undergraduate degree, spent 1 year in pharmacy school in 1976 and had an intern pharmacy license but never received a degree. He received his D.D.S. from Washington University in St. Louis in May 1981. He completed a 2-year residency at Mt. Zion Hospital/University of California at San Francisco and returned to the East Coast to work as an associate in a New York City dental practice. In 1984 he purchased his present practice from a retiring dentist for $80,000 with a $10,000 CT Page 1832 downpayment, financing the remaining $70,000 over 5 years.
Dr. Ross initially claimed to have paid off the loan for his practice in 2 years but an examination of Plaintiff's Exhibit 14 demonstrated this would not have been possible using his earned income. Exhibit 14 shows Dr. Ross earned $4,691 in 1984, $36,476 in 1985, $37,000 in 1986 and $43,800 in 1987. During the same period of time he purchased the building his dental practice is located in and a condominium in Torrington, CT.
Shortly before the couple's wedding they purchased a home in Avon for $320,000. The Husband testified that the $64,000 downpayment came from the sale of his Torrington condominium ($50,000 to $55,000) and the difference was from his premarital savings. The couple resided in Avon until 1990 when they purchased the present family home.
The court finds the Husband's testimony regarding the purchase price of his dental practice and the downpayment on the couple's first home in Avon, CT to be credible. The court is therefore giving Dr. Ross an $80,000 credit for the premarital value of his dental practice and a credit for $64,000.00 for the downpayment on the couple's first home as premarital assets.
Dr. Ross claimed he assisted his Wife financially in setting up her company, Powerhouse Advertising, by buying her a FAX machine, computer, copier and carpeting. Mrs. Ross disputes this claim, testifying that the office was furnished from income from freelance clients. She also testified that the Husband replaced the FAX machine at the suggestion of a marriage counselor after he threw it down a flight of stairs in a fit of rage.
During the period from 1992 to the present the Wife earned the bulk of the family income but the couple divided the major family expenses 50/50 according to the testimony of both parties.
In 1994 the Husband claimed to have paid the bulk of the family expenses and introduced canceled checks (Plaintiff's Exhibit 35) to document his payments. The only problem with Dr. Ross' contention is the bills he claims to have paid far exceed his net income. Dr. Ross claims to have made $32,549.00 in mortgage payments and $39,031.95 in other household payments for a total of $71,580.95 while earning a salary of $66,500 before taxes. During this period of time, the Wife testified that she opened two joint accounts at Thomaston Savings containing approximately $30,000 which the Husband withdrew sometime in 1994 (Defendant's Exhibit S). This additional money would have given him the financial resources to pay the bills he claims to have paid, but the CT Page 1833 funds clearly were not all derived from his income as he claimed.
During the marriage the Husband has consistently earned approximately $50,000 to $60,000 per year as follows:
1992 $48,095 (Plaintiff's Exhibit 1(a))
1993 $65,400 (Plaintiff's Exhibit 1(b))
1994 $66,500 (Plaintiff's Exhibit 1(c))
1995 $54,700 (Plaintiff's Exhibit 1(d))
1996 $46,650 (Plaintiff's Exhibit 1(e))
1997 $50,220 (Plaintiff's Exhibit 1(f))
1998 $57,153 (Plaintiff's Exhibit 1(g))
1999 $53,000 (Plaintiff's Exhibit 1(h))
 2000 $50,500 (Plaintiff's Exhibit 1(j)), with a pension contribution of $21,675.
 2001 $52,000 (Plaintiff's Exhibit 1(j)), with a pension contribution of $21,322.
The testimony of both the Husband and his Office Manager, Peggy Kearns, indicate that he works 4 days per week, Monday through Thursday, from approximately 9:00 a.m. to 5:00 p.m. Dr. Ross claims he turns down only Title XIX patients and works as hard as possible with the number of patients he has. He testified that when he purchased the practice there were 9 dentists in Torrington; there are now 30, so competition has increased. The Defendant's expert witness, Gary R. Trugman (Defendant's Exhibit R), testified that Dr. Ross deducted $4,957 in automobile expenses and $3,086 in auto insurance expenses for three vehicles in 2001. Based on the nature of Dr. Ross' practice, Mr. Trugman deemed these deductions excessive and would have added back in the bulk of the automobile and insurance expenses as income to Dr. Ross. Additionally, Dr. Ross made a pension contribution of $21,322 in 2001 that Mr. Trugman added back in to determine Dr. Ross' true income. The court finds that this testimony is credible and finds that Dr. Ross' income is understated by approximately $29,365.00 in 2001. The court does not agree with Mr. Trugman that 100% of the rent Dr. Ross paid for his dental practice should be added back to his income. Rent is an ordinary and necessary CT Page 1834 business expense for any business and should be deducted as a legitimate business expense. The Defendant introduced no credible evidence to convince the court that the rent was excessive or, if it was excessive, what the fair market value of the rent actually was. The court is therefore not adding back into Dr. Ross' income the rent he paid for the dental practice space as income.
The court finds that the Husband had a premarital investment in his dental practice in the amount of $80,000.00 and made the $64,000 downpayment on the couple's first home which represent the proceeds from the sale of his premarital condominium. The court has given the Husband a credit of $144,000 for his premarital contributions. Additionally, the Husband owned the building his dental practice is located in prior to the marriage. At the beginning of the dissolution, the building had some equity but the Husband re-mortgaged the property and invested the proceeds in repairs to the building. Despite the repairs made to the building the Husband claims this building has a negative equity due its location. Given the fact that the building is clearly a premarital asset, the Husband shall receive this asset free of any claim of the Wife.
While the Wife did not enter the marriage with the same assets the Husband did, she did receive, by way of gift or inheritance, the sum of $280,000 from her parents during the marriage. Most of this money was invested in the purchase of the family home, the Wilton condominium, the lot adjacent to the family home and the costs of refinancing the family home twice. Therefore, the Wife is entitled to a credit of $280,000 and a credit of $150,000 for the advance property distribution made to the Husband so he would vacate the family home.
 Fault
The Wife alleged that the marriage was destroyed by the Husband's addictions to pornography; the bodybuilding life style and use of steroids; rage, delusions, emotional and physical abuse; dishonesty; refusal to work for a living; and obsession with guns.
The Wife testified that the Husband collected vast quantities of pornographic magazines and videos and downloaded pornography from the Internet that he left lying around the home where the minor children could see it. She testified that her Husband's taste in pornography was hard core and impeded their sex life because the pornography represented everything she was not. She introduced Defendant's Exhibit Q as a representation of the pornography the Husband collected and testified that Dr. Ross kept the pornography in the couple's bedroom, the couple's CT Page 1835 bathroom, den, stairway landing and the first-floor bathroom. Mrs. Ross indicated that all these areas were accessible to the minor children. She testified that she asked her Husband to get rid of the pornography and he responded "get used to it." Dr. Ross admitted he did obtain pornographic materials and attributed it to his Wife's lack of interest in an intimate relationship with him. He initially described the videos he kept as soft core and as depicting women who were models — with content that was all heterosexual, not graphic and what could be described as artistic. Dr. Ross testified that the pornographic magazines ranged from Muscle and Fitness bodybuilding magazines to Playboy and Penthouse. During cross-examination, Dr. Ross' memory was refreshed by his testimony at his deposition where he classified his collection of pornography as "hard core" and admitted to having it in his possession on a pretty steady basis. An examination of the magazines contained in Exhibit Q indicates the material is not all heterosexual in nature and verifies it is not what the court would consider soft core porn.
Dr. Ross admitted to using two post office boxes to receive some of the pornographic material, to receive letters from two personal ads he placed during the marriage, and to receive prescriptions for anabolic steroids from overseas sources. Dr. Ross claims to suffer from a medical condition called hypogonadism and alleged he had a valid prescription for the testosterone and other steroids he ordered from overseas suppliers. He did admit he used an alias, Dr. Alan Beck, and a Waterbury, CT and Springfield, MA post office box to receive these medications. Dr. Ross claimed his Wife ridiculed him when he told her of his diagnosis in 1992.
The Wife described the Husband's views of his driving habits as an example of his delusions. He reportedly claimed he was a better driver at 80 mph than his Wife was at 55 mph. Mrs. Ross described Dr. Ross as being convinced that attorneys, contractors, and therapists were out to "get" doctors and this attitude ultimately involved the couple in a series of unpleasant lawsuits.
Dr. Ross also had three gas masks, which he told his wife were for use in the event of anarchy in the government. When the Wife pointed out that the family contained four members and there were only three gas masks, her Husband replied that "three of four will live and one will die."
The Husband also collected guns and admitted the guns were in a gun safe in the family home until 1999. Dr. Ross thought he had removed all the guns from the family home by 1999 but admitted history showed he missed one. He currently has nine guns in the safe in his dental office; one was destroyed by the State Police after it was discovered in the CT Page 1836 family home, by Mrs. Ross, in Dr. Ross' briefcase.
Mrs. Ross testified that Dr. Ross was obsessed with body building and spent so many hours at the gym that they were unable to have a normal family or adult social life. She testified that he worked out at the gym 3-4 hours weekdays and five hours per day on the weekends. Mrs. Ross stated that Dr. Ross was a member of four gyms and had a home gym as well. Defendant's Exhibit N is a copy of a sexually explicit letter Dr. Ross wrote in responding to a personal advertisement. In the letter he indicates he "enjoyed 2 hour workouts 5 nights a week" which substantiates the Wife's claim that he spent many hours at the gym working out. Dr. Ross himself admitted that on average he spent 10-12 hours a week at the gym but claimed he fit his workouts around his family and work responsibilities.
Dr. Ross also took numerous dietary supplements, powders, vitamins and creams to bulk up or slim down. Mrs. Ross testified there were 75 to 100 bottles of pills in the family home. Typically, if Dr. Ross was "shredding" (described as intentional rapid weight loss), he would have a protein drink for breakfast chased with twenty pills, a metabolite bar or tuna for lunch, another protein drink for dinner, and more pills and 6-8 cups of coffee before he would work out. When Dr. Ross was "bulking up," he would eat a high protein diet consisting of ten egg whites for breakfast and three or four steaks for dinner. The family joke was that Dr. Ross was a human vacuum cleaner when bulking up.
In addition to Exhibit N, Dr. Ross admitted to having sexual encounters with two women during his marriage: one was described by Dr. Ross as a one-night-stand at a Las Vegas convention and the other was with a woman he met at the gym in the fall of 2000. The relationship became intimate before Dr. Ross filed for divorce and the woman is currently his girlfriend.
The couple did not dispute the fact that money and Dr. Ross' earning capacity had been an issue in the marriage. Dr. Ross testified that he felt there was more to life than filling and drilling teeth and that his Wife nagged him to expand his practice with a satellite office or return to school to develop a dental specialty.
The couple disputed which parent spent more time with their oldest son Jason when he was diagnosed as autistic. The Husband claimed he made and took the child to the majority of the appointments to obtain a diagnosis. The Wife claimed she attended most of these appointments and spent from 5:00 p.m. to 9:00 p.m. doing therapy with Jason. Mrs. Ross claimed she did 98% of the therapy with Jason. Dr. Ross countered that he CT Page 1837 put together balance beams in the backyard, a chin-up bar in the basement and worked with his son to develop his gross motor coordination while the Wife focused on verbal development. The Husband claimed that the parties spent an equal amount of time on Jason's therapy. The parties both agree that Jason no longer has problems that require special attention.
Dr. Ross claimed that Mrs. Ross was over controlling and rigid about money after the first two years of marriage and he simply went along with her demands. In defense, Mrs. Ross claimed Dr. Ross was jealous of her success in business and superior earning power. She testified that every time she landed a new client he would stage a fight with her, preventing her from enjoying her success.
Based on the evidence and testimony discussed in detail above, the court finds that the bulk of the fault for the breakdown of the marriage rests with Dr. Ross. In fact, the fault attributed to the Wife by the Husband appeared to the court to be the result of the Husband's behavior (lack of interest in intimate relations due to the pornography and body building lifestyle). The court gave the Husband credit for his premarital assets of $144,000, did not count the building his dental practice is located in due to negative equity, and gave him a reduced share of the property settlement due to the advance property distribution of $150,000 (given to him as an incentive to vacate the family home). The Husband purchased a condominium located at 392 Trailsend Drive, Torrington, CT, with the advance property settlement and paid for it in cash. He later mortgaged the property; the condominium has equity of approximately $100,000.00. The court is using the dollar amount of the advance distribution rather than the equity in the real estate to compute the Husband's share of the marital property. The court gave the Wife a credit for her $280,000 inheritance. The remaining marital property shall be divided with approximately 60% going to the Wife and 40% to the Husband as a result of the fault described above. The court deliberately did not deduct the costs of sale from the value of the Wilton condominium.
 ORDERS
After considering all of the statutory criteria set forth in General Statutes § 46b-84 as to support of a minor child, § 46b-215a-1 et seq., Regs. Conn. State Agencies, as to child support, § 46b-62 as to counsel fees, § 46b-66a as to conveyance of real property, §46b-81 as to assignment of property and transfer of title, § 46b-82
as to the award of alimony, § 46b-84 as to medical insurance for minor child, together with applicable case law and the evidence presented here, the court hereby enters the following orders: CT Page 1838
1. DISSOLUTION OF MARRIAGE
A decree dissolving the marriage, on the grounds of irretrievable breakdown, shall enter on February 6, 2003.
2. CHILD SUPPORT
The Husband shall immediately pay to the Wife the sum of $149.00 per week as child support for the two children, said sum being in compliance with the Child Support Guidelines. In addition, the Husband shall pay the sum of $69.00 per week towards the minor children's daycare expenses for a total support order of $218.00 per week.
The obligations of support and maintenance of the minor children shall terminate as each such child attains the age of eighteen (18) years, marries, dies, becomes employed full time being no longer enrolled in high school, or ceases to reside with the Wife under circumstances where the Wife is no longer furnishing the child's support or becomes otherwise emancipated, whichever occurs first.
Notwithstanding that a child has reached the age of eighteen (18) years, if the child is a full time high school student and continues to reside with the Wife, the Husband shall continue to pay child support as specified above, until the child completes the twelfth (12) grade or attains the age of nineteen (19) years, whichever occurs first.
3. MEDICAL INSURANCE — HUSBAND
If the Husband desires, he shall pay 100% of the costs of COBRA medical insurance coverage, from the Wife's employer, for his medical expense insurance for as long as she is legally able to provide it.
4. MEDICAL INSURANCE AND UNREIMBURSED MEDICALS — CHILDREN
The Wife shall maintain, at her sole expense, the present medical/dental insurance for the children, which is provided to the Wife through her employment. If said insurance is no longer available to the Wife through her employment, the parties shall equally share the cost of obtaining such medical and dental insurance. The Wife shall be responsible for the first $100.00 per year of unreimbursed medical and dental expenses. Thereafter, the parties shall split the cost of any unreimbursed medical, dental, optical, psychological, orthodontic and prescriptive drug expenses, incurred on behalf of the minor children, according to the Guidelines (the Wife's share being 77% and the husband's share being 23%) for as long as the Husband is obligated to pay child CT Page 1839 support for said children. The Wife shall submit all documentation for unreimbursed medical expenses within 30 days of her receipt of the documentation. The Husband shall pay the Wife his share of the unreimbursed medical expenses for the minor children within 30 days of his receipt of documentation from the Wife.
5. CUSTODY/VISITATION
The court finds that the agreement of the parties dated January 21, 2003, regarding custody and visitation is in the best interest of the minor children and it is incorporated herein by reference. The court shall retain jurisdiction over this matter for the next year to monitor progress of the parenting plan and maintain continuity of the court orders regarding custody and visitation.
6. REAL PROPERTY
a. FAMILY HOME: The Husband shall immediately transfer to the Wife, all of his right, title and interest in and to the marital residence, located at 111 Richards Road, Litchfield, CT. Thereafter, the Wife shall be solely responsible for the mortgage, real estate taxes, homeowners insurance, utilities and all other costs associated with the upkeep and maintenance of the home (from the date of this decision forward) and shall indemnify and hold the Husband harmless in regards to such costs.
b. LOT ADJACENT TO FAMILY HOME: The Husband shall immediately transfer to the Wife, all of his right, title and interest in and to the lot adjacent to the marital residence, located at 109 Richards Road, Litchfield, CT. Thereafter, the Wife shall be solely responsible for the mortgage, real estate taxes, and all other costs associated with the upkeep and maintenance (from the date of this decision forward) associated with the property and shall indemnify and hold the Husband harmless in regards to such costs.
c. WILTON CONDOMINIUM: The condominium located at 3 Wilton Crest, Wilton, CT, shall be listed for sale within 15 days of the date of the judgment. The parties are to fully cooperate in the listing, showing and closing of the property. The parties shall immediately list the property for sale at an initial asking price as recommended by a MLS real estate agent familiar with real property values in the Wilton, CT area. If the parties cannot agree on a listing broker, terms of the listing or like details, the court shall decide on the listing broker and terms of the listing from a list of four brokers submitted by the parties. The parties shall accept the first bona fide offer within 5% of the asking price. If the home is not sold within 45 days of listing, the price shall be CT Page 1840 reduced by agreement of the parties after consultation with their real estate broker. After all expenses from the sale of the home (gross proceeds less the payoff of the first mortgage, realtor commissions, attorneys fees for sale, conveyance taxes and recording fees), the Husband shall receive the remaining proceeds.
d. DENTAL PRACTICE BUILDING: The Husband shall keep as his sole property his interest in 469 Prospect Street, Torrington, CT. The Husband shall be solely responsible for the mortgage, real estate taxes, utilities and all other costs associated with the upkeep and maintenance of the property (from the date of this decision forward) and shall indemnify and hold the Wife harmless in regards to such costs.
e. HUSBAND'S COMDOMINIUM: The Husband shall keep as his sole property his interest in 392 Trailsend Drive, Torrington, CT. The Husband shall be solely responsible for the mortgage, real estate taxes, condominium fees, utilities and all other costs associated with the upkeep and maintenance of the property and shall indemnify and hold the Wife harmless in regards to such costs.
7. ALIMONY
By agreement of the parties, neither party shall pay alimony to the other. The court finds that both the Husband and the Wife are fully capable of supporting themselves.
8. PENSIONS, IRA ACCOUNTS, 401K ACCOUNTS AND DEFERRED COMPENSATION ACCOUNTS
The parties shall divide all pensions, IRA accounts, 401K accounts and deferred compensation accounts as listed below by means of Qualified Domestic Relations Orders, if needed. The parties shall equally share in the cost of preparing the necessary documents. Each party shall be awarded joint and survivorship benefits to protect each party in the event of the other's death.
Asset Husband's Wife's
Share Share
Wife's Schwab Keough 0 $124,108.00
Wife's Schwab IRA 0 1,463.00
Wife's Schwab IRA 0 80,052.00 CT Page 1841
Wife's Fidelity IRA 4,968.50 17,251.50
Wife's Janus Fund 0 6,356.00
Wife's Sogen IRA 0 29,668.00
Wife's Monitor 401K 0 18,321.00
Wife's Minnesota Life 0 1,233.00
Husband's Profit Sharing Plan 37,047.00 0
Husband's Roth IRA 1,632.00 0
Husband's Pension Trust 40,053.00 0
Husband's IRA Fleet 44,625.00 0
Husband's Schwab IRA 29,454.00 0
TOTAL $157,779.50 $278,452.50
9. STOCKS, BONDS MUTUAL FUNDS
The Husband and Wife shall divide their stocks, bonds and mutual funds as follows:
Asset Husband's Wife's
Share Share
Wife's Fidelity Acct. 50%* 50%*
Wife's Schwab Brokerage 0 1,870.00
Wife's Schwab Powerhouse 50%* 50%*
*Valued as of the date of dissolution
10. BANK ACCOUNTS
The Husband and Wife shall keep as their sole property the bank accounts listed on their respective Financial Affidavits. CT Page 1842
11. BUSINESS AND BUSINESS INTERESTS
The husband shall keep as his sole property his dental practice with a stipulated value of $175,000 and a premarital value of $80,000.00. He shall hold the Wife harmless and indemnified from any debts and/or obligations of said business.
The Wife shall keep as her sole property her Monitor Partnership interest with a purchase price of $70,000.00. The Wife claimed a partner in Monitor informed her this asset had a liquidation value of $45,000.00. The court does not find this testimony credible because the partnership interest was recently acquired and along with the partnership interest the Wife has a guaranteed salary of $250,000.00 per year.
12. LIFE INSURANCE
The Husband and Wife shall both continue to maintain life insurance in the amount of $500,000.00 with the minor children as the beneficiaries until both children reach the age of majority. The Husband and Wife shall provide to the other proof of said insurance on an annual basis.
13. PERSONAL PROPERTY
The Wife shall be entitled to keep the personal property she inherited from her mother's estate as her sole property including furniture, china and art work. The remainder of the personal property shall be equally divided by the parties. If the parties cannot come to an agreement, the matter shall be referred to the Litchfield Family Relations Services. If no agreement is reached with respect to any item of personal property, the court shall resolve the dispute on motion of either party.
14. EDUCATIONAL SUPPORT
The educational accounts established for the minor children shall be held in trust by both parents as co-trustees and used for the minor children's postsecondary school education. If the accounts are not adequate to fund the children's postsecondary school education, pursuant to Public Act #02-128, An Act Concerning Educational Support, due to the parties' failure to waive their right to request educational support for their minor children, the court shall retain jurisdiction over the parents' contribution towards the payment of the children's higher education.
15. MOTOR VEHICLES
CT Page 1843
The parties shall be entitled to their respective motor vehicles and shall hold the other harmless and indemnified from all outstanding loans, personal property taxes and registration. If it is necessary to transfer title and/or registration to either or both of the vehicles, the parties shall complete the necessary paperwork within 30 days of the date of judgment.
16. DIVISION OF DEBTS
Except as otherwise provided herein, the Husband shall be responsible for the debts on his financial affidavit and the Wife shall be responsible for the debts on her financial affidavit.
17. INCOME TAX EXEMPTIONS
The Husband and Wife shall each take one child as a dependent for income tax purposes every year for as long as the Husband's child support and unreimbursed medical expense payments are current. When one child is available as a dependency exemption the parties shall alternate the exemption with the Husband having the exemption in even numbered years and the Wife having the exemption in odd numbered years.
18. ATTORNEY FEES
The Wife shall be solely responsible for her own attorney fees (if any). The Wife utilized marital assets to pay her legal fees while this matter was pending. The Husband did not have access to these funds as the accounts were only in the Wife's name. The Wife shall therefore reimburse the Husband 50% of the legal fees he paid in connection with these proceedings. The Wife shall make payment to the Husband within 45 days of the date of judgment.
The parties shall equally share the total cost of the fees for the attorney for the minor children with credit for any amounts paid on account. The fees for the attorney for the minor children shall be paid in full within 45 days of the date of judgment.
19. INTERIM POSTJUDGMENT ORDERS
These orders shall be considered interim postjudgment orders in the event of an appeal by either party.
20. JURISDICTION
The Regional Family Trial Docket shall retain jurisdiction over this case for a period of one year from the date of judgment; any motions regarding custody and/or visitation shall be filed with the Regional Family Trial Docket.
BY THE COURT,
Holly Abery-Wetstone, Presiding Judge CT Page 1844
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1844-a